******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

D'AURIA, J., dissenting in part. Because I cannot conclude, as the majority does, that the trial court's unnecessary questioning of the defendant's two expert witnesses, Brooke W. Kammrath and Jamie Lincoln Kitman, "was [not] so extensive, substantial, or adverse" as to deprive the defendant of a fair trial, I respectfully dissent as to part I of the majority opinion and would order a new trial. I do not reach parts II and III of the majority opinion.

The majority opinion has much to commend it. It is researched thoroughly and written persuasively. It is also candid in describing the challenged questions of the trial court as "unnecessary," "ill-advised and best left unasked," and "not exhibit[ing] the restraint or caution that the circumstances demanded . . . ." I agree with the majority that "[t]he line between permissible and impermissible questioning is not always easy to delineate" and that, as we have stated before, "[t]here is simply no handy tool with which to gauge a claim that a judge's conduct improperly has shifted the balance against a defendant." (Internal quotation marks omitted.) Part I of the majority opinion, quoting *State* v. *Fernandez*, 198 Conn. 1, 13, 501 A.2d 1195 (1985), and *United States* v. *Nazzaro*, 472 F.2d 302, 304 (2d Cir. 1973). Ultimately, whether a trial court's active questioning of witnesses deprives a defendant of a fair trial is a matter of degree, and an issue on which reasonable appellate jurists can disagree (even if there might be disagreement over whether I fall within that category of jurists). Because the claim is unpreserved, it is, of course, not possible to ascertain precisely either the effect of the court's questions on the jury, or the court's purpose in asking them. I cannot and do not ascribe to the trial court any partisan intent on this record. Nonetheless, I believe the possibility of harm was grave here, and I am convinced that, viewed objectively, the court's questions discredited the defendant's expert wit-

nesses and could have been viewed by the jury as an expression of the court's approval of the state's position on issues "key to the outcome of the jury's verdict," as the majority describes them. Part I of the majority opinion; see *State* v. *Smith*, 200 Conn. 544, 549, 512 A.2d 884 (1986) (trial court "should never assume a position of advocacy, real or apparent, in a case before it, and should avoid any displays of hostility or skepticism toward the defendant's case, or of approbation for the prosecution's [case]").

I do not draw much guidance from federal case law that the majority cites or that I have reviewed. See, e.g., *Daye* v. *Attorney General*, 712 F.2d 1566, 1570 (2d Cir. 1983), cert. denied, 464 U.S. 1048, 104 S. Ct. 723, 79 L. Ed. 2d 184 (1984). It is possible that federal courts tolerate significant intrusions by district courts in the form of questioning witnesses before they will conclude that the questioning deprives a defendant of a federal constitutional right. But I believe that the majority will agree that, because the defendant's trial took place in *our* courts, we are equally responsible for determining—in fact, principally responsible and perfectly well-equipped to determine—whether the defendant received a fair trial under the due process clause of the federal constitution. See *Pompey* v. *Broward County*, 95 F.3d 1543, 1550 (11th Cir. 1996) ("state courts are courts of equal dignity with all of the federal 'inferior courts'— to use the [f]ramers' phrase—and state courts have the same duty to interpret and apply the United States [c]onstitution as [federal courts] do").

I agree with the majority that "it is proper for a trial court to question a witness in endeavoring, *without harm to the parties*, to bring the facts out more clearly and to *ascertain the truth* . . . ." (Emphasis added; internal quotation marks omitted.) Part I of the majority opinion, quoting *State* v. *Fernandez*, supra, 198 Conn. 13. A trial judge who considers it his job to examine

witnesses as part of the judiciary's truth-seeking function risks unduly influencing the jury, however, particularly when he believes that one of the parties came up short with their questions. This is because "[t]he influence of the trial judge on the jury is necessarily and properly of great weight and his lightest word or intimation is received with deference, and may prove controlling." (Internal quotation marks omitted.) *Quercia* v. *United States*, 289 U.S. 466, 470, 53 S. Ct. 698, 77 L. Ed. 1321 (1933). We have held that, when "[t]he outcome of the trial depended largely on the jury's assessments of the respective credibility of [the state's witness] and the defendant," a new trial was warranted when the court questioned the state's witness "in a manner that tended to enhance the [witness'] credibility in the jury's eyes." *State* v. *Smith*, supra, 200 Conn. 550–51.

The majority notes that "[t]he defendant's trial spanned several days and involved the testimony of twenty-four witnesses." In juxtaposition, the majority points out that "the defendant's constitutional challenge is limited to the trial court's brief questioning of three witnesses, one of whom testified on behalf of the state." I focus on only two of the witnesses: the defendant's experts, Kammrath and Kitman.[1] I do not believe that the number of witnesses called during the trial or the number of questions the defendant challenges is an accurate measure of the impact that the trial court's

---

[1] I do not believe that the trial court's questions of Detective Martin Heanue, which the majority admits were "unnecessary," impacted significantly enough on the fairness of the defendant's trial to warrant discussion in this opinion. I do not agree, however, with any implication, if intended by the majority, that the fact that Heanue testified on behalf of the state meant that the trial court's questions of Heanue somehow counterbalanced the court's questions to the defendant's experts. The court's questions of Heanue appear to emphasize precautions the police took with the photographic array, even though the state had already covered the rationale for the double-blind identification procedure in its direct examination.

active questioning had on the fairness of the defendant's trial. Brief questioning can be very effective, even devastating, especially coming from the trial judge. Moreover, whether intentional or not, the trial court managed to have the last word as to the main two witnesses the defendant called in his own defense.

Nor, in my view, were the trial court's questions confined to clarifying for the jury or elucidating the court's own understanding of the witnesses' testimony. See *State* v. *Smith*, supra, 200 Conn. 549–50. Instead, I read the trial court's questions as susceptible to being interpreted by the jury as supporting the state's case and expressing skepticism of the defendant's expert witnesses, whose credibility was key to the jury's acceptance of their conclusions. For these reasons, I cannot conclude that the defendant received a fair trial.[2]

## I

After the state rested, defense counsel called Kammrath, an expert in forensic science, to rebut the state's evidence regarding gunshot residue in the defendant's car. The state had presented evidence from eyewitnesses to the victim's shooting that the car's occupant and the victim were engaging in a struggle in the car, during which the occupant shot the victim. Previously, the state had presented testimony from two experts, Alison Gingell and Amy Duhaime, that laboratory testing revealed elements of gunshot residue in the defendant's car, supporting the state's theory that the victim had been shot while in the defendant's car. Gingell's and Duhaime's testimony was far from incontrovertible, however. First, the state's initial tests of three collected

[2] I acknowledge that my review of the evidentiary record leaves me with the impression that the state's case had significant strength, although it was far from airtight. Nonetheless, I do not believe—and do not believe that the majority contends—that the strength of the state's case, even if it were overwhelming, will always defeat a claim of an unfair trial. See, e.g., *State* v. *Williams*, 204 Conn. 523, 540–41, 529 A.2d 653 (1987).

samples came back negative for gunshot residue. The state had Duhaime explain that retesting of the samples was undertaken because the machine initially used failed a monthly performance check. Only upon retesting, more than one year later, did the laboratory report the presence of antimony, barium, and lead, elements associated with gunshot residue.

These findings were still arguably uncertain, however, as became evident when Gingell and Duhaime testified about information not included in the second laboratory reports to explain what the results indicated. To start, two of the three samples tested contained particles possessing only two of the three elements—antimony and barium—present in gunshot residue. Although these elements may be considered "consistent with" gunshot residue, the existence of those elements in a single particle is insufficient to determine that gunshot residue was in fact present. Lead is the third element, and it was not contained in these two samples. The third sample tested contained a particle containing all three elements, but even then, the most the state's experts could conclude is that this particle is "characteristic of" gunshot residue. As Gingell herself testified, it can be said that a sample contains gunshot reside only if antimony, barium, and lead are "found in one particle and . . . *they form a sphere, a perfect sphere* . . . ." (Emphasis added.)

When defense counsel called Kammrath, she emphasized that it would be inaccurate to categorize the samples as gunshot residue when (1) antimony, barium, and lead were not all present, and (2) the state had failed to identify the specific morphology of the particles. Kammrath's expert opinion was necessarily limited to her review of the lab reports admitted through Gingell's testimony because, as the jury soon learned, Kammrath had not heard and was not responding to the trial testimony of Gingell or Duhaime because she was not pres-

ent for that testimony the day before. In particular, Kammrath had not heard Gingell testify that antimony, barium, and lead only constitute gunshot residue if the elements form "a perfect sphere . . . ." During cross-examination of Kammrath, the state sought to establish that she did not "look at the evidence in this case" and that the lab reports did not include "all of the technical backup as to how they reached these results." Kammrath readily admitted both points. "So," the prosecutor asked, "in terms of the morphology of the spherical nature of the gunshot residue contained in [sample] three, could it have been contained in that pack of materials, and that's why they concluded it was indicative of gunshot residue?" Kammrath responded: "It's possible, but it should have been in the report."

After the state's cross-examination and defense counsel's redirect examination, the following colloquy took place between Kammrath and the trial court:

"The Court: . . . Miss, are you familiar with Alison Gingell . . . ?

"[Kammrath]: Alison who?

"The Court: Alison Gingell.

"[Kammrath]: No, I'm not.

"The Court: What about Amy Duhaime?

"[Kammrath]: Yes.

"The Court: Alright. You're familiar with her. And were you present when either of them testified?

"[Kammrath]: No, I wasn't.

"The Court: Alright. So, you . . . don't know what their representations were about [the samples recovered from the defendant's Maxima]? Correct?

"[Kammrath]: Correct. I don't know."

So as not to leave this colloquy with the court as the last the jury heard from his expert, defense counsel sought to ask a follow-up question about the definition of gunshot residue propounded by the American Society for Testing and Materials. But the trial court, unprompted by any objection, shut down any further questioning, stating, "I think you're going beyond the scope here, counsel. I asked about two witnesses . . . ." Defense counsel responded: "I understand, but we repeatedly referred to this as gunshot residue, so I believe that's a mischaracterization." The trial court replied that "[i]t'll be the jury's recollection as to what those witnesses said about the findings of the analyses."

The majority does not attempt to defend the court's inquiries of Kammrath and admits that the questions "could have been perceived [by the jury] to suggest, at least vaguely and by implication, that Kammrath was unaware of the opinions offered [in court] by [the state's] witnesses or that the judge believed that the testimony of [those] . . . witnesses contained information that Kammrath may have overlooked." In my view, this implication was unmistakable. The issue of morphology was not addressed in the lab reports. This was among Kammrath's main criticisms of them: without knowing the morphology of the particle, it cannot be categorized as gunshot residue. Gingell had testified that, for a particle containing antimony, barium, and lead to constitute gunshot residue, it must "form . . . a perfect sphere," but she did not go so far as to testify that the single, three element particle found in one of the samples actually formed a perfect sphere. After Kammrath had criticized the state's lab report for not addressing morphology, however, the state sought to rehabilitate its gunshot residue evidence by suggesting that "the morphology of the spherical nature of the gunshot residue" might have been reflected in the "technical backup" material but left out of the report, "and

that's why . . . [the state lab] concluded it was indicative of gunshot residue." Kammrath protested: "It's possible, but it should have been in the report." By making clear to the jury that Kammrath was not present when Gingell or Duhaime testified, and that she therefore did not know what their representations were *in court*—something the state had not even asked about precisely—the trial court risked being seen as reminding the jury that the state's witnesses had discussed morphology, and also as associating itself with the state's line of questioning by suggesting that Kammrath did not know whether the state's experts had already considered morphology in reaching their conclusions. I believe that, viewed objectively, these questions, combined with the court's questions to Kitman, the defendant's final expert witness, deprived the defendant of a fair trial.

## II

Identification of the car in the video surveillance footage that captured the events surrounding the victim's murder was another hotly contested issue at trial. With Kitman,[3] the defendant's last expert witness, defense counsel sought to poke holes in the testimony of the state's witnesses who claimed that the video depicted a 2011 Nissan Maxima, the same make and model of the car owned by Frank Bridgeforth, the defendant's foster father, and driven regularly by the defendant.

Kitman testified that, after examining Bridgeforth's Maxima and watching the video footage, it was his expert opinion that the vehicle in the video was not a Maxima but was most likely a Chevrolet Impala. This

---

[3] Kitman was an automative journalist who had written exclusively about automobiles for more than thirty years in publications including The New York Times, The Washington Post, and the Los Angeles Times. In addition, Kitman is president of a company that supplies cars to movies and television programs, a member of the Society of Automative Historians, and has served as a judge in car shows.

opinion was consistent with the recollections of Javon Gaymon, an eyewitness to the murder. Although Gaymon testified at trial that the defendant's car looked like the car he saw on the night of the murder, he also admitted that he had told the police several times around the time of the murder that the car had a brand emblem with a silver deer, which was consistent with an Impala, not a Maxima, and that he told the police that the car had tinted windows. He also testified that the police suggested to him that he was wrong about the brand of the car.

Most pertinent to the trial court's questioning, Kitman explained that Bridgeforth's Maxima had very little or no tint on the windows, whereas the car in the video had heavily tinted windows. Kitman reached this conclusion because it was possible to see light emanating from within and outside of other cars in the video, but the black car that the victim had entered was "completely blacked out. And that is different than what you would have gotten with [Bridgeforth's Maxima]."

On cross-examination, the prosecutor asked Kitman, "other than blacked out tinting, there's other things that may obscure somebody [from] seeing inside a car, correct?" Kitman responded that, certainly, if the windows were "covered," "like, if you had a curtain up in the car or something," it "wouldn't be [possible] to see inside . . . or outside" the car. Kitman also conceded that it is possible to disable the interior lights to prevent them from illuminating when car doors are opened. After the prosecutor and defense counsel had exhausted their questions for Kitman, the trial court inquired of him:

"[The Court]: . . . So, 2011 is the model year of the Maxima that you examined?

"[Kitman]: I believe, yes.

"[The Court]: Alright. And do you know if that year model had a device in the car that would allow you to dim the dashboard lights?

"[Kitman]: I don't specifically, but I assume that you could dim them.

"[The Court]: That's a pretty—that's been around for a long time, right?

"[Kitman]: Mm-hmm.

"[The Court]: You can make the dashboard brighter?

"[Kitman]: You can—most cars you can. I mean, for the last seventy-five years, I think you could dim the lights.

"[The Court]: And do you know if the 2011 Maxima had a pull up sunshade in the back door window?

"[Kitman]: I don't believe so."

With that, Kitman's testimony, along with all evidence in the trial, ended.

Viewed objectively, the import of the trial court's questions in this context was, in my view, unmistakable. The state's cross-examination had sought to make clear to the jury that the occupant of the car might have covered the window or disabled the interior lights to prevent illumination from escaping. Once again, the trial court expounded on the state's questions, suggesting to the jury that there might be other explanations for light failing to escape from the Maxima: dimming the dashboard lights or putting up a sunshade.[4]

Generously, the majority describes the court's extra questioning as "not exhibit[ing] the restraint or caution that the circumstances demanded . . . ." The majority

[4] In my view, it does not matter that Kitman's answer to the trial court's question about the sunshade was that he did not believe that the 2011 Maxima "had a pull up sunshade in the back door window . . . ." By asking its additional questions, the trial court risked appearing to jurors to have associated itself approvingly with the state's immediately preceding suggestion that there were other ways, besides tinting, in which it "wouldn't be [possible] to see inside . . . or outside" the car. Reasonable jurors likely know a vehicle owner could purchase and install a sunshade, even if it was not standard equipment.

does not seek to justify why the "embodiment" of courtroom neutrality would ask such questions[5] but merely suggests that "the jury was well aware that there were various reasons why the interior of the car depicted in the video surveillance footage may have appeared dark other than the presence of a heavy tint on the windows." The harm to the defendant, however, in my view, came not simply from the jury's hearing other explanations as to why that light might not escape from the car's interior, but from the very real prospect that the jury would view the trial court as associating itself with the state's cross-examination. Our case law cautions against a trial court's exhibiting "skepticism toward the defendant's case, or of approbation for the prosecution's [case]." *State* v. *Smith*, supra, 200 Conn. 549. If Kitman was right in his expert opinion that the car he saw in the video was not a Maxima, then it was highly unlikely that the state's witnesses were right that they saw the defendant at the scene. By continuing the state's line of questioning, the court risked being seen by the jury as essentially expressing approval of the state's cross-examination, and simultaneously exhibiting skepticism toward the opinion of Kitman, whose credibility was "key to the outcome of the jury's verdict . . . ." Part I of the majority opinion. As such, I cannot conclude that the trial court safeguarded the defendant's right to a fair trial.[6]

Accordingly, I respectfully dissent as to part I of the majority opinion.

---

[5] I do not agree with the state that the court "properly intervened to clarify factual matters that had been raised by the state's direct examination—i.e., whether it was possible to obscure the view of a car's interior either by covering the windows or by dimming a car's dashboard lights." On the contrary, I believe that, by this line of questioning, the trial court, even if well-intentioned, could have been seen as "assum[ing] a position of advocacy" by raising alternative explanations that the state had failed to explore. *State* v. *Smith*, supra, 200 Conn. 549.

[6] I agree with the majority that, "if the trial court exercises its discretion to question a witness, the court should instruct the jury . . . that the court's

questions to witnesses should not be taken by the jury as an indication of its opinion as to how the jury should resolve any issues of fact." The Judicial Branch's model criminal jury instructions have contained such a general cautionary instruction for nearly one decade, including a specific admonition to the jury not to be "influenced by" the trial judge's own questions to witnesses. Connecticut Criminal Jury Instructions 2.1-2, available at https://www.jud.ct.gov/ji/criminal/Criminal.pdf (last visited August 19, 2024). Connecticut case law has recognized such a cautionary instruction for at least as long. See, e.g., *State* v. *Rosario*, 209 Conn. App. 550, 565–66, 267 A.3d 946, cert. denied, 342 Conn. 901, 270 A.3d 98 (2022); *State* v. *Swilling*, 180 Conn. App. 624, 644–45, 184 A.3d 773, cert. denied, 328 Conn. 937, 184 A.3d 268 (2018); *State* v. *Fernandez*, 169 Conn. App. 855, 874–75, 153 A.3d 53 (2016). For reasons not apparent from the record, however, the trial court's cautionary instruction did not contain a specific warning about the court's own questions, instead instructing only that its "actions during the trial in ruling on motions or objections by counsel, or in comments to counsel or in setting forth the law in these instructions are not to be taken by you as any indication of [its] opinion as to how you should determine or resolve questions of fact." Although a cautionary instruction can sometimes prevent harm or prejudice from a party's or a trial court's actions, neither the majority nor the state can rely on such an instruction in the present case to counteract what, in my view, was the almost certain impact of the court's questions on the jurors. See, e.g., *Filakosky* v. *Valente*, 175 Conn. 192, 196, 397 A.2d 95 (1978) (cautionary instructions "tend to remove any doubts that the court properly discharged its duty of leaving the jury free to determine the facts and draw [its] own conclusions therefrom" (internal quotation marks omitted)).